IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, EASTERN DIVISION

| | | |
|---|---|---|
| BEVERLY MILLS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 3:11cv529-MHT |
| | ) | (WO) |
| CITY OF PHENIX CITY, | ) | |
| ALABAMA, | ) | |
| | ) | |
| Defendant. | ) | |

OPINION

Plaintiff Beverly Mills brings this lawsuit charging
that defendant City of Phenix City, Alabama terminated
her employment in violation of her due-process rights (as
protected by the Fourteenth Amendment, as enforced
through 42 U.S.C. § 1983) and discriminated against her
on the basis of her gender in violation of Title VII of
the Civil Rights Act of 1964, as amended, 42 U.S.C.
§§ 1981a, 2000e through 2000e-17. Mills also asserts a
state-law defamation claim. Jurisdiction is proper
pursuant to 28 U.S.C. § 1343 (civil rights), 42 U.S.C.

2000e-5(f)(3) (Title VII), and 28 U.S.C. § 1367 (state law).

The city now moves for summary judgment.  For the reasons that follow, the motion will be granted.


## I.  SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  Here, Mills is the non-moving party.


## II.  BACKGROUND

After 30 years in the banking industry and a brief retirement, Mills began working for Phenix City in

2

January 2003.  She was hired as an office manager in the city's utilities department.   Her responsibilities included numerous administrative tasks, processing payroll, and authorizing employee reimbursements.

The city divides its employees into 'classified' and 'unclassified' positions.  Its merit-system rules "apply to all positions in the Merit System except those in the Unclassified Service."  City Rules (Doc. No. 13-6) at 2. The rules further state that, "Provisions with respect to General Provisions, Position Classification Plan, Compensation Plan, Attendance and Leave Regulations and Employee Relations apply to full-time employees in the Unclassified Service except elected officials, members of the advisory boards, commissions and committees."  Id. at 2-3.  Per the rules, only classified employees are entitled to a hearing.

It is undisputed that, at the time of hiring, Mills's office-manager position was 'classified' under the city's merit-system rules.  At that time, unclassified employees

3

included, amongst others, the city manager, aides to the
city manager, the city clerk, the city attorney,
department directors, and temporary employees.  But, on
February, 15, 2005, the city council passed ordinance
number 2005-02, which added office managers to the list
of unclassified positions.  According to the city, this
ordinance transferred Mills to the unclassified service,
notwithstanding the fact that she had been hired as a
classified employee.

Mills's disciplinary troubles began in October 2007
when she was given a verbal warning and counseling for
permitting a subordinate employee to handle payroll.
Verbal Warning Form (Doc. No. 13-1) at 1.  The city
states that only Mills and Utilities Director Greg Glass
were authorized to process payroll.  Mills responds that
Glass had directed her to let the subordinate employee
handle the payroll.  It is undisputed that only Mills was
written up for insubordination for this incident.

4

In August 2009, Mills received two disciplinaries. In one incident, she altered the time cards of Trevor Truitt in violation of city policy.[1]  She contends that Truitt had been taking only 20 minutes of his allotted 30-minute lunch break and that she altered the time cards to prevent him from making a claim for unpaid overtime. According to Mills, the alteration of time cards was a common occurrence in the city's utilities department. Mills received an eight-hour suspension for the time-card alterations.  Written Warning Form (Doc. No. 13-2) at 1.

Around the same time, Mills was again written up, this time for insubordination for a separate incident. She had been advised by City Manager Wallace Hunter that, if any issue arose during Utilities Director Steve Smith's extended absence, she should contact Hunter. When employee Charles Woody approached Mills about

---

1.  The record and briefing contain three different first names for Truitt: Trevor, Travor, and Travis.  The court uses the first name 'Trevor' because it is the most frequently used name and appears on the city's official documents.

another employee's absence from a training program, Mills and Woody called Smith on his cell phone to ask for help. Mills states that Smith had instructed her to call him if a problem arose.   Nonetheless, Mills was disciplined for ignoring Hunter's command and received an eight-hour suspension.   Written Warning Form (Doc. No. 13-3) at 1.[2]

The city terminated Mills on July 14, 2010, after she had approved fraudulent purchase orders submitted by Truitt.   A city investigation had revealed that Truitt and finance-department employee Sylvia Suttle were romantically involved and had conspired to defraud the city.   Truitt submitted false reimbursement requests for expenses such as air fresheners, foot powder, and car repairs.   Mills approved these requests in her role as office manager.   According to the city, Mills's actions

---

2.   Mills received a fourth reprimand in April 2010 for forwarding a chain email about coping with grief shortly after her husband died.   She was suspended for 40 hours for this violation.   Written Warning Form (Doc. No. 13-4) at 1.   She concedes that she violated the city's prohibition against sending chain emails.   Opposition Brief (Doc. No. 20-1) at 4.

were negligent and merited termination in light of her prior reprimands.   Mills responds that none of the purchases raised red flags; that she processed 75 to 80 pay requests daily; and that her supervisor (Smith) was equally responsible for approving Truitt's requests.

During the course of the fraud investigation, Mills was interviewed by the police but never charged with a crime.   The story also garnered local media attention. Mills has submitted affidavits from members of her community detailing the rumors surrounding her termination.

After Mills was fired, Smith gathered all the utilities-department employees and informed them of Truitt and Suttle's affair and fraudulent scheme.   Smith commented that Mills had been fired for authorizing the improper reimbursement charges.   According to an affidavit submitted by utilities-department employee Marcy Williams, Smith's speech left the impression that

7

Mills had been part of Truitt and Suttle's conspiracy. Williams Affidavit (Doc. No. 19-6) at 2.

Mills sought an administrative hearing before the city's personnel-review board and appeared at a meeting of the city council.  The review board and city council refused to hear Mills's appeal on the ground that she was an unclassified employee outside the city's merit-system rules.  This lawsuit followed.

## III.  DISCUSSION

### A.  Due Process

Mills makes two separate claims under the Due Process Clause as enforced through § 1983.  First, she contends that her right to 'procedural' due process was violated by the city when it fired her without a hearing.  Second and relatedly, Mills asserts a 'stigma-plus' claim: that the city defamed her when it terminated her and failed to provide an avenue to clear her name.

### 1.  Procedural Due Process

Mills claims that she had a property interest in her job and that the city violated that interest when it terminated her.  The court rejects this claim for two reasons.  First, this claim is abandoned or waived, for, while it was presented in her complaint, it was not addressed in her summary-judgment brief.  Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) ("grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned").  Second, as will now be explained, this claim lacks merits.

A public employee is entitled to procedural due process if she has a property interest in her position.  Bishop v. Wood, 426 U.S. 341, 343-47 (1976).  A property interest exists if an employee has "an individual entitlement grounded in state law, which cannot be removed except 'for cause.'"  Logan v. Zimmerman Brush Co., 455 U.S. 422, 430 (1982).  The Supreme Court has instructed that "'property' interests subject to

9

procedural due process protection are not limited by a few rigid, technical forms.  Rather, 'property' denotes a broad range of interests that are secured by 'existing rules or understandings.'" Perry v. Sindermann, 408 U.S. 593, 601 (1972) (quoting Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972)).  Of course, a unilateral expectation of continued employment is insufficient to trigger due-process protections. Bishop, 426 U.S. at 345-47.

The parties dispute whether Mills had a property interest in her employment.  Mills believes that the city's classification system is unclear and that the rules and disciplinary procedures used by the city created a property right in her employment.

The court notes at the outset that Alabama has jealously guarded its status as an "at will" employment state.  See, e.g., Ex parte Amoco Fabrics and Fiber Co., 729 So. 2d 336, 339 (Ala. 1998) ("The bedrock principle of Alabama employment law is that, in the absence of a

contract providing otherwise, employment in this state is at-will, terminable at the will of either party.  Under this doctrine, an employee may be discharged for any reason, good or bad, or even for no reason at all.").  Therefore, governmental employees in Alabama do not acquire a property interest in their employment as long as they remain in the terminable-at-will realm.

The city's 2005 ordinance clearly transferred the office-manager position from the classified to unclassified service.  2005 Ordinance (Doc. No. 13-7) at 1.  As such, there is no ambiguity as to the designation of the office-manager position and Mills was not a classified employee entitled to a hearing.

To be sure, an employee need not have an explicit contract to move into the realm of for-cause employment.  Alabama cases establish that, in certain circumstances, an employee handbook may vest property rights in employment.  Hoffman-LaRoche, Inc., v. Campbell, 512 So. 2d 725, 735 (Ala. 1987) (holding that "the language

contained in a handbook can be sufficient to constitute an offer to create a binding unilateral contract"). But these cases are inapposite when the handbook expressly avows that it does not create a property interest in employment. Id. at 734 (commenting that "if the employer does not wish the policies contained in an employee handbook to be construed as an offer for a unilateral contract, he is free to so state in the handbook"). Whether employee handbooks or other employee rules constitute a binding contract is a question of law to be decided by the court. Campisi v. Scoles Cadillac, Inc., 611 So.2d 296, 298-99 (Ala. 1992).

Here, the city's rules unequivocally state that they do not create a property interest: "The city reserves the right to change or depart from the Merit System Rules and Regulations. Nothing in these Rules and Regulations shall be construed as an employment contract between any individual and the city covering any term or condition of employment." Merit System Rules (City's Exhibit 1) at

12

12.   Courts construing Alabama law have held similar "language prevents the handbook from supporting a contract of employment other than for at-will employment." <u>Nicholson v. City of Daphne</u>, 2009 WL 4667382, *6 (S.D. Ala. Nov. 25, 2009) (Steele, J.). <u>See also</u> <u>Hoffman-LaRoche</u>, 512 So. 2d at 734 (providing as an example of at-will employment: "[t]his Handbook and the policies contained herein do not in any way constitute, and should not be construed as a contract of employment between the employer and the employee, or a promise of employment"). Thus, Mills cannot point to the city's merit-system rules to establish a property right in her employment.

Mills refers to language in her termination letter and three of the disciplinaries as the source of her right to a hearing. When she was fired, Mills was asked to sign beneath the following paragraph:

> "I further acknowledge I have been informed of my right to appeal the disciplinary action taken against me to the Appeals Board or the Personnel

> Review Board.   My request must be
> submitted in writing to the Personnel
> Director within three (3) working days
> for the Appeal Board and within ten (10)
> working days for the Personnel Review
> Board.  Probationary employees are not
> entitled to a Personnel Review Board
> Hearing as stated in Section 15.011 of
> the Merit System Rules and Regulation."

Termination Letter (Doc. No. 13-5) at 3.

This argument is unavailing for two reasons.  First, as discussed above, the city's rules--which define the disciplinary procedures--cannot form the basis for a property right because the city included a disavowal clause in its handbook.  Second, it is axiomatic that "'property' cannot be defined by the procedures provided for its deprivation."  <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. 532, 541 (1985).  One cannot "construct a property interest out of procedural timber .... 'The categories of substance and procedure are distinct.'"  <u>Bunger v. University of Oklahoma Bd. of Regents</u>, 95 F.3d 987, 990-991 (10th Cir. 1996).  Thus, the city's "promise that it would follow certain

14

procedural steps in considering [Mills's termination] did not beget a property interest in [it]." Id. at 991. As such, Mills cannot rely on a boilerplate procedural instruction in a disciplinary form as the basis for a property right when none otherwise exists.

Alternatively, Mills contends in both his complaint and summary-judgment brief that the city violated her due-process right when it reclassified her position in 2005 and, thus, that the city could not terminate her without a hearing in 2010. Here, the distinction between an executive and legislative act is of paramount importance. As the Eleventh Circuit Court of Appeals has explained:

> "Executive acts characteristically apply to a limited number of persons (and often to only one person); executive acts typically arise from the ministerial or administrative activities of members of the executive branch. The most common examples are employment terminations. ...
>
> "Legislative acts, on the other hand, generally apply to a larger segment of--if not all of--society; laws and

15

> broad-ranging executive regulations are the most common examples. The analysis, and the substantive/procedural distinction discussed above, that is appropriate for executive acts is <u>inappropriate</u> for legislative acts. For instance, only when addressing legislative acts has the Supreme Court mandated that states must demonstrate that they are violating private interests only as necessary to promote state interests."

<u>McKinney v. Pate</u>, 20 F.3d 1550, 1557 n.9 (11th Cir. 1994) (en banc) (citations omitted). The 2005 reclassification was a legislative act: the city council passed an ordinance transferring an entire group of employees from the classified to unclassified service. There was no individualized consideration. Mills's argument that the city could not reclassify office managers is not cognizable as a procedural due-process claim. She may bring a procedural due process violation for only the paradigmatic executive act at issue in this case--her termination.[3]

_____

    3. Finally, Mills claims that she was 'grandfathered' into the classified service. Mills's contention

(continued...)

16

2.   **Stigma-Plus**

Mills also raises a 'stigma-plus' claim. Specifically, she alleges that the city defamed her and failed to provide a hearing to clear her name.  A public employee seeking to establish a stigma-plus claim must prove that: "(1) a false statement (2) of a stigmatizing nature (3) attending a governmental employee's discharge (4) was made public (5) by the governmental employer (6) without a meaningful opportunity for employee name clearing." Cannon v. City of West Palm Beach, 250 F.3d 1299, 1301 (11th Cir. 2001).  A stigma-plus claim "requires the plaintiff to show both a valid defamation claim (the stigma) and the violation of some more tangible interest (the plus)." Rehberg v. Paulk, 611 F.3d 828, 852 (11th Cir. 2010) (internal quotation marks omitted).

---

(...continued)
misinterprets Alabama case law.  She relies on cases where Alabama law explicitly 'grandfathered' in certain employees.  Morrison v. Booth, 763 F.2d 1366, 1368 (11th Cir. 1985) (discussing the 'grandfathering' process).  No such grandfather clause exists in this case.

17

Mills's stigma-plus claim must fail because she cannot prove defamation.[4]   To establish a defamation claim, Mills must show "'[1] that the defendant was at least negligent [2] in publishing [3] a false and defamatory statement to another [4] concerning the plaintiff, [5] which is either actionable without having to prove special harm (actionable per se) or actionable upon allegations and proof of special harm (actionable per quod).'" Ex Parte Crawford Broadcasting, 904 So. 2d 221, 225 (Ala. 2004) (quoting Delta Health Group, Inc. v. Stafford, 887 So. 2d  887, 891 (Ala. 2004)).

--------

4.   The court notes that there must be a 'plus' in a stigma-plus case.  See Rehberg, 611 F.3d at 852 ("The 'stigma-plus' test requires not only allegations stating a common-law defamation claim, but also an additional constitutional injury, tied to a previously recognized constitutional property or liberty interest, flowing from the defamation.").  The court has concluded that Mills lacks a property interest in her employment, see supra Section III.A.1.  As such, Mills can prevail only if she had a liberty interest in her employment.  Because the court concludes that there is no 'stigma,' it declines to address whether a public employee can have a liberty interest in continued employment when a property interest does not exist.

18

"Truth is an absolute defense to a defamation claim." S.B. v. Saint James School, 959 So. 2d 72, 100 (Ala. 2006). The First Amendment compels a defense of truth to defamation claims, lest state tort law "interfere with the truth-seeking function of the marketplace of ideas." Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 52 (1988). However, "there is no constitutional value in false statements of fact." Gertz v. Robert Welch, Inc., 418 U.S. 323, 340 (1974) (emphasis added).

The question, then, is whether Smith uttered a false statement of fact when he announced Mills's termination. Mills provides the following account of the city's defamatory speech:

> "On or about July 14, 2010, Stephen Smith met with all of the employees of the utilities department. He told us that Beverly Mills and two other employees (Trevor and Sylvia) had been fired. He said that Trevor and Sylvia had been having an affair. He said that Sylvia had been helping her boyfriend Trevor to hide improper reimbursement charges. <u>Smith said that Beverly was fired for signing invoices that should not have been signed.</u> In this meeting,

> Mr. Smith lumped Beverly Mills together
> with Trevor and Sylvia, giving the false
> impression that Beverly was part of
> their scheme to steal from the City."

Williams Affidavit (Doc. No. 19-6) at 2 (emphasis added).

Nothing in Williams's affidavit evidences that a false statement was made.  Mills was terminated by the city for her negligent approval of Truitt and Suttle's fraudulent scheme and Smith's speech reflects that fact. Williams's account of Smith's speech places a far greater emphasis on the involvement between Truitt and Suttle; Mills is referenced with regards to only her approval of the reimbursements, not the fraud itself.  Thus, Williams's "false impression" of Smith's speech is not synonymous with a 'false fact.'

Additionally, Mills cites to a local newspaper article--that neither mentions her by name nor contains any false statement--and affidavits from friends who have heard rumors about why she was terminated.  A rumor mill's insinuations that Mills was actively and knowingly involved in the fraudulent scheme does not transform

Smith's statement into a falsehood.  Because the city did not state a falsehood, Mills's stigma-plus claim must fail.[5]

B.  Gender Discrimination

A gender-discrimination claim brought under Title VII is governed by the familiar burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under the McDonnell Douglas framework, a plaintiff has the initial burden of establishing a prima-facie case of unlawful employment discrimination by a preponderance of evidence.  Id. at 802.  If the plaintiff establishes a prima-facie case, the burden then shifts to the defendant to rebut the presumption by articulating a legitimate,

_____

5.  Mills also asserted a state-law defamation claim. She has conceded that summary judgment is due to be granted on this claim.  See infra Section III.C.

It could be argued that, because the stigma-plus test requires proof of "a common-law defamation claim," Rehberg, 611 F.3d at 852, Mills's concession defeats her stigma-plus claim as well.

non-discriminatory reason for its employment action.  The defendant has the burden of production, not of persuasion, and thus need not convince the court that the reason advanced actually motivated its action.  Id.

Once the defendant satisfies this burden, "the presumption of discrimination is eliminated and the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima-facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the [defendant] were not the real reasons for the adverse employment decision."  Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc) (internal quotation marks omitted).  In other words, a plaintiff must show that a defendant's proffered explanation is a mere pretext for discriminatory conduct.

To establish a prima-facie case of discriminatory discipline, Mills must show that: (1) she belongs to a protected class; (2) she was subjected to adverse job

action; and (3) her employer treated similarly situated employees outside her protected classification more favorably.  Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (per curiam).

The city contends that the three pre-termination disciplinaries are not tangible-employment actions cognizable under Title VII.  In Burlington Industries v. Ellerth, 524 U.S. 742 (1998), the Supreme Court explained that a "tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Id. at 761. Although context specific, a "tangible employment action in most cases inflicts direct economic harm."  Id. at 762.

Here, Mills was suspended without pay on two relevant occasions prior to her termination.[6]  "While a suspension

_____

6.   Mills does not contend that the chain-letter
(continued...)

is not the most severe punishment, it still qualifies as a tangible-employment action" because there is direct economic harm.  <u>Adams v. City of Montgomery</u>, 2012 WL 1414979, *6 (M.D. Ala. Apr. 24, 2012) (Thompson, J.). Moreover, because the city's progressive disciplinary policy factored in the three contested disciplinaries into the termination decision, each of them is actionable to that extent.  <u>Id</u>.

The city fares better on its next arguments.  The city argues that Mills has failed to identify a valid comparator.  "To make a comparison of the plaintiff's treatment to that of [male] employees, the plaintiff must show that [s]he and the employees were <u>similarly situated in all relevant respects</u>."  <u>Holifield</u>, 115 F.3d at 1562 (emphasis added).  The Eleventh Circuit requires that "the quantity and quality of the comparator's misconduct be <u>nearly identical</u> to prevent courts from

─────────────────────

(...continued)
disciplinary was discriminatory.  As such, the court omits it from the discussion of Mills's Title VII claim.

second-guessing employers' reasonable decisions and
confusing apples with oranges." <u>Maniccia v. Brown</u>, 171
F.3d 1364, 1368 (11th Cir. 1999) (emphasis added).

For the October 2007 reprimand, the August 2009
insubordination suspension, and the July 2010
termination, Mills cites her immediate supervisors, Glass
and Smith, as comparators.[7]  Of course, a supervisor is
not "similarly situated" to a subordinate employee.  As
to the time-card suspension, Mills submits that other
employees regularly edited time cards and were not
suspended.  Mills, however, has not presented evidence
that another office manager altered time cards and that
the same supervisor knew and failed to punish this
person.  As such, Mills cannot establish a prima-facie
case of discriminatory discipline.  Moreover, Mills has
not presented evidence that any male employee had a

---

7.  Mills also claims that Woody was not punished for
his role in the phone call to Smith in contravention of
Hunter's directive.  But Mills clearly states that she
and Mitchell were informed of Hunter's order, not Woody.
<u>See</u> Mills Deposition (Doc. No. 19-16) at 13.

history of rules violations similar to hers but was not terminated.

In addition to the lack of a comparator, Mills has not produced any evidence of pretext.  While Mills may dispute the fairness and severity of the disciplinaries, she does not dispute that her behavior occurred.  Rather, she submits that her actions was excusable because her immediate supervisor authorized it or engaged in similar behavior (in contradiction to his supervisor's pronouncements and/or city rules). Mills listened to her immediate supervisor, not the chain-of-command.  As such, the city's leadership had a legitimate, non-discriminatory reason for disciplining Mills: she violated work rules by ignoring city rules and the direct orders of her higher-ranking supervisors.

### C.  Defamation

In her opposition brief, Mills concedes that summary judgment should be granted on her defamation claim

26

because "she has been unable to produce sufficient evidence to show actual malice by the City." Opposition Brief (Doc. No. 20-1) at 20. As such, the court will grant defendant City of Phenix City's motion for summary judgment as to this claim.

\* \* \*

An appropriate summary judgment in favor of Phenix City and against Mills will be entered.

DONE, this the 16th day of July, 2012.

        /s/ Myron H. Thompson    
    UNITED STATES DISTRICT JUDGE